UNITED STATES of America,
Plaintiff-Appellee,

v.

Alexander ENGLISH et al.,
Defendants-Appellants.

Nos. 73-1379, 73-1380 and 73-1381.

United States Court of Appeals,
Seventh Circuit.

Argued Jan. 14, 1974.

Decided Aug. 16, 1974.

Joseph D. Anderson, South Bend, Ind., Donald S. Eisenberg, Madison, Wis., for defendants-appellants.

John R. Wilks, Fort Wayne, Ind., John S. Leonardo, Asst. U. S. Atty., South Bend, Ind., for plaintiff-appellee.

Before KILEY, Senior Circuit Judge, CUMMINGS and SPRECHER, Circuit Judges.

SPRECHER, Circuit Judge.

Defendants Alexander English, Sam Hubbard, Jr. and Rufus Gaines appeal from convictions upon a jury trial for violations of 18 U.S.C. § 2113(a) and

(e).[1]  Each defendant was sentenced to life imprisonment.

I

On December 22, 1971, at about 4:40 p. m., an armored truck belonging to Indiana Armored Car Service, Inc., was robbed by three black males in the vicinity of St. Mary's College, north of South Bend, Indiana. Money belonging to a bank, the deposits of which were insured by the Federal Deposit Insurance Corporation, was stolen; the driver of the truck, who had been alone, was shot and killed.

In addition to the confession of defendant Gaines, which is dealt with in Part VI, the facts were derived from a host of circumstantial evidence adduced from several witnesses.

Thomas Bright, Jr., the son of one of the owners of Indiana Armored Car Service, Inc., observed a 1967 or 1968 Buick Wildcat of greenish gold color with a license commencing with "45" following the armored truck on the afternoon prior to the robbery. Bright noticed three black males in the automobile.

Louise Smith, an employee of a hospital north of South Bend and near the site of the robbery, noticed the armored truck making a pickup at the hospital at 4:30 p. m. on December 22. At the same time she observed an automobile with a license commencing with the numbers "45" in the hospital parking lot with two black males inside, one of whom she identified as defendant English.

David Lee, who was driving home from work, saw two black males push a uniformed truck driver into an armored truck between 4:40 and 4:50 p. m. at the parking lot of Randall's Inn north of South Bend and a few blocks north of St. Mary's College.

Sue Fenters, who was being driven home from work by her sister, noticed the armored truck leaving the parking lot of Randall's Inn and going south between 4:40 and 4:45 p. m., with one black male driving and a second black male in the passenger side of the front seat.

Thomas Broden, a professor at Notre Dame Law School who was driving his son to work, observed an armored truck parked on an access road to St. Mary's College at approximately 4:46 p. m., with a male leaning against a greenish medium-sized car parked next to the truck.

Police Officer Douglas Schultz discovered the armored truck parked on the St. Mary's access road at about 4:57 p. m., with its doors locked and engine running. Marion Cooper, the truck driver, was lying face up inside the truck. The coroner of St. Joseph County testified that Cooper died at approximately 4:45 p. m. from gunshot wounds in the head and chest.

Lee Andrews, an acquaintance of all three defendants, testified that he was the owner of a 1968 Buick Wildcat colored charcoal gray with an avocado green top which he had loaned to defendant English for four or five days in December of 1971. The certificate of registration for Andrews' Buick showed that the 1971 license plate number was 45 G 6184. Traffic records showed that English had an accident with Andrews' car on December 17, 1971 and received a speeding ticket on December 18, 1971.

Gerald Bywater testified that he observed Gaines fire a firearm on Decem-

---

1.  Section 2113(a) provides in part: "Whoever, by force and violence, or by intimidation, takes, or attempts to take, from the person or presence of another any property or money or any other thing of value belonging to, or in the care, custody, control, management, or possession of, any bank, credit union, or any savings and loan association; . . . shall be fined not more than $5,000 or imprisoned not more than twenty years, or both."

Section 2113(e) provides in part: "Whoever, in committing any offense defined in this section, . . . kills any person, or forces any person to accompany him without the consent of such person, shall be imprisoned not less than ten years . . . . ."

ber 20, 1971. Police later recovered a spent slug from the scene of that firing. Evan Hodge, an F.B.I. firearms identification expert, testified that a "reasonable" or "strong" probability existed that the spent .38 caliber slug recovered from the floor of the armored truck was fired from the same firearm that witness Bywater had observed Gaines firing a few days prior to the robbery, and that a bullet taken from Cooper's body was fired from the same weapon as the slug from the truck.

Naomi Fairchild, another acquaintance of all three defendants, saw English, Hubbard and Gaines on the evening of December 22 in her apartment in Gary, Indiana, when they had in their possession a money bag, money wrapped in bank wrappers and pistols. She heard English say that they should "get rid of those wrappers that was around the money because they were hot."

Barbara Glass, Gaines' girl friend, testified that she was acquainted with all three defendants; that about December 20, 1971 she and the three defendants went to South Bend in a Buick automobile; that on December 22, she saw all three defendants in the same car; and that the same evening she saw Gaines with a Holiday Inn pillowcase with money in it. A registration card from a Holiday Inn at Gary, Indiana, showed that English had checked into the motel at about 4:45 p. m. on December 22, 1971. Gary is in the Central Standard time zone and South Bend is in the Eastern Standard zone, so that it was then 5:45 p. m. at South Bend. The distance between Gary and South Bend is about 45 miles.

Naomi Fairchild testified that she heard English say that he had purchased a new car at the end of December, 1971. Edward Kasper, an automobile salesman in Gary, Indiana, testified that he sold English a new Buick Riviera automobile on December 27, 1971, for $4,700, which English paid in cash, and that $600 to $1,000 of that amount was in one dollar bills.

Barbara Glass further testified that in January, 1972, English and Hubbard told her that "the FBI would be getting in contact with me and not to say anything" and that it was about "some kind of car, armored car." At that time, English had a black suitcase with money in it.

II

█ Defendants' first argument was that the district court erred in not permitting them to inspect the minutes of the grand jury which indicted them, so that they could determine whether the indictment was based on hearsay and whether the grand jury had probable cause to indict them.

The Supreme Court held in Costello v. United States, 350 U.S. 359, 361–364, 76 S.Ct. 406, 100 L.Ed. 397 (1956), that an indictment based exclusively on hearsay evidence is not constitutionally invalid and that a defendant is not entitled to litigate the sufficiency of evidence presented to the grand jury.

Rule 6, Fed.R.Crim.P., provides that the secrecy of grand jury proceedings may be violated "when permitted by the court at the request of the defendant upon a showing that grounds may exist for a motion to dismiss the indictment because of matters occurring before the grand jury."

Disclosure is "committed to the discretion of the trial judge" and "[t]he burden . . . is on the defense to show that 'a particularized need' exists for the minutes which outweighs the policy of secrecy." Pittsburgh Plate Glass Co. v. United States, 360 U.S. 395, 399, 400, 79 S.Ct. 1237, 1240, 1241, 3 L. Ed.2d 1323 (1959).

Defendants make no such showing of "a particularized need." In view of Costello, here there is "no indication that the court below abused its discretion in not ordering the grand jury minutes produced for defendants." United States v. Newcomb, 488 F.2d 190, 192 (5th Cir. 1974).

## III

■ Defendants' second argument was that they were prejudiced by the delay in the furnishing of discoverable government material. Defendant Gaines was granted discovery on May 12, 1972 and did not receive the government material until August 18.

On May 12, only Gaines had been indicted and was before the court. When a motion for enforcement of the May 12 order came up for hearing on July 6, the government pleaded that Gaines' attorney had a conflict of interest because he also represented English and Hubbard in other unrelated matters and that to disclose matters to Gaines would prejudice the government's potential case against English and Hubbard. The district court requested briefs on the question of conflict of interest. Thereafter, on August 11, the court denied the government's motion to disqualify Gaines' attorney.

In the light of the intervening indictment of Gaines, Hubbard and English on July 14, 1972, the denial of the government's motion was conditioned on first holding a hearing to determine whether Gaines' waiver of his right to separate independent counsel was understandingly and intelligently made. Campbell v. United States, 122 U.S.App. D.C. 143, 352 F.2d 359 (1965).

On August 18, 1972, the three defendants were arraigned in the present case and each entered a plea of not guilty. The district court then ascertained defendants' knowing and intelligent waiver of the right to separate independent counsel. On that same day the government turned over discoverable material to defense counsel.[2]

In view of Campbell v. United States, *supra*, relied upon by the district court, it cannot be considered that the conflict of interest argument advanced by the government was frivolous. In *Campbell*, the court said at 360–361:

> The judge's responsibility is not necessarily discharged by simply accepting the co-defendants' designation of a single attorney to represent them both. An individual defendant is rarely sophisticated enough to evaluate the potential conflicts, and when two defendants appear with a single attorney it cannot be determined, absent inquiry by the trial judge, whether the attorney has made such an appraisal or has advised his clients of the risks. Considerations of efficient judicial administration as well as important rights of defendants are served when the trial judge makes the affirmative determination that co-defendants have intelligently chosen to be represented by the same attorney and that their decision was not governed by poverty and lack of information on the availability of assigned counsel. We must indulge every reasonable presumption against the waiver of the unimpaired assistance of counsel.

For this reason, and because the defendants had all discoverable material more than five months prior to the present trial, and because the defendants failed to make any showing that they were prejudiced by the delay in receiving discoverable materials, we conclude that defendants' argument in this regard is without basis.

## IV

■ Defendants next argued that they were prejudiced by failure to grant them preliminary hearings. All three defendants were charged by complaints on March 10, 1972. Gaines waived his right to a preliminary hearing at arraignment before the magistrate and the preliminary hearing for Hubbard and English was set for March 24, 1972. On

---

2. On August 19, 1972, government counsel gave defense counsel "additional discoverable items, stating . . . that it had not been turned over earlier 'through an oversight' on the part of the Assistant United States Attorney." Affidavit of Defense Counsel, August 28, 1972.

that date, the government called Gaines, who had promised to testify to the facts of the robbery just as he had given them to an F.B.I. agent earlier. However, on the stand, Gaines changed his testimony. Government counsel filed a motion for a continuance with the district court, based upon Gaines' surprise change of position.

Before a preliminary hearing was held pursuant to Gaines' motion to withdraw his waiver thereof, an indictment was returned against him on April 19, 1972. The preliminary hearings for Hubbard and Gaines were not rescheduled and the complaints against them were dismissed for failure to hold a preliminary hearing within the time specified. However, indictments were returned against both of them and Gaines on July 14, 1972. Therefore, rather than a delay of preliminary hearings by the government, there actually were no preliminary hearings held due to indictments returned by the grand jury.[3]

"[O]nce an indictment has been returned a preliminary hearing is not required." United States v. Farries, 459 F.2d 1057, 1061 (3d Cir.), cert. denied, 409 U.S. 888, 93 S.Ct. 143, 34 L.Ed.2d 145 (1972).

### V

Defendants contended that they were denied their constitutional right to a speedy trial.

Gaines was first indicted on April 19, 1972 and all three defendants were indicted on July 14, 1972. The first trial, which resulted in a hung jury, took place from November 7 to 12, 1972; the second trial, resulting in the convictions, occurred on January 22 thru 25, 1973.

The major cause of delay between the original complaints against the defendants on March 10, 1972 and the indictment on July 14 was Gaines' repudiation of his oral confession. Each complaint was based in part on "a statement made by Rufus Gaines to the complainant [Special Agent P. Whitaker] that on 12/22/71 he, Alexander English, and Sam Hubbard forcibly commandeered and robbed an armored vehicle . . . at a location North of South Bend, Indiana, and put in jeopardy the life of Marion C. Cooper, and killed said Marion C. Cooper."[4]

On March 10, 1972, in his initial appearance before the magistrate, Gaines, after being advised of his right to a preliminary hearing and to be represented by counsel, waived his right to a preliminary hearing and executed the written form waiving his right to counsel. On March 24, 1972, at the preliminary hearing before the magistrate on the charges against English and Hubbard, the government called defendant Gaines who "denied any knowledge of the incident"; the proceedings were recessed. On that same day, Gaines retained the attorney who has continued to represent him through his appeal.

On April 4, 1972, Gaines filed a motion for an order granting permission to withdraw his waiver of a preliminary hearing and for a preliminary hearing. The district court set a hearing for April 17, which was reset at the request of defendant's counsel for April 21. On

3. 18 U.S.C. § 3060(e) provides: "No preliminary examination in compliance with subsection (a) of this section shall be required to be accorded an arrested person, nor shall such arrested person be discharged from custody or from the requirement of bail or any other condition of release pursuant to subsection (d), if at any time subsequent to the initial appearance of such person before a judge or magistrate and prior to the date fixed for the preliminary examination pursuant to subsections (b) and (c) an indictment is returned or, in appropriate cases, an information is filed against such person in a court of the United States."

4. The complaint was also based on a statement by Sergeant Larry Fishburn reciting where the vehicle had been found, that there had been a robbery and that the driver was killed, and on a statement by Everett D. Badger, vice president of the St. Joseph Bank and Trust Company, that a portion of the money taken was the property of said bank which was insured by the Federal Deposit Insurance Corporation.

April 19, 1972, the grand jury indicted Gaines.

Gaines was vigorously and aggressively represented; his counsel raised every possible defense in a lengthy series of motions. At the close of the hearing on some of those motions on July 6, the following occurred:

The Court: I would just like to make this other comment before we adjourn for the day. I would like to set this case for trial but these delays are being occasioned, sir, by your part.

Mr. Eisenberg: No, your Honor.

The Court: I disagree.

Mr. Eisenberg: I believe the delay is from what the United States Attorney has not given me over the past six weeks and is a delay caused by the Government, and we want the record to show that, and I believe this man cannot go to trial until he has a Motion to Suppress and then I'm ready for trial. . . .

Thereafter Gaines filed his motion to suppress on August 25, 1972, the hearing on the motion was held on August 31, and trial began on November 7.

Inasmuch as we have held in Part III that the government's conflict-of-interest argument in delaying the turnover of discoverable material was not frivolous, the government did not deliberately procrastinate in order to prejudice the defendants. Defendants have failed to show that they were prejudiced.

Balancing the factors of length of delay, the reason the government assigns to justify the delay, the assertion of the right to a speedy trial by the defendants and the lack of a showing of prejudice to the defendants, we conclude that the defendants were not deprived of their due process right to a speedy trial. Barker v. Wingo, 407 U.S. 514, 92 S.Ct. 2182, 33 L.Ed.2d 101 (1972).

## VI

Defendant Gaines argued that his oral confession was involuntary and that the district court erred in failing to suppress it. .

Gaines testified at the suppression hearing on August 31, 1972 that he had been in penal institutions for eighteen of his thirty-one years; that since age fifteen he had been a heroin user whenever he was not incarcerated; that each time he returned to jail he kicked his habit "cold turkey"; that prior to his arrest in March, 1972, he had been "on the streets" for about one year and was a steady heroin user with a $200 to $300-a-day habit; that he gave himself a fix consisting of seven or eight $5 packets of heroin six or seven times a day; that each fix lasted three to four hours; that on March 7, 1972, he had between six and seven fixes; that on March 8 between 6:30 and 7:00 a. m. he had a $35 fix; that he was detained by store employees for shoplifting at about 9:30 on the morning of March 8; that he was taken to the Gary police station sometime after 10:00 a. m.; that he was then taken to an upstairs cell-block where he remained for about three or four hours; that he began getting sick and that when he requested medical treatment from the turn-key he was told that treatment was "up to the detectives"; that he was beginning heroin withdrawal and described his symptoms as nausea, vomiting, and "spitting" caused by mucus draining into the throat; that he was then taken to an interrogation room where two F.B.I. agents questioned him about a robbery in Benton Harbor, Michigan and the armored truck robbery in South Bend.

Gaines further testified that though he was offered food he could not eat anything during March 8 and 9 and that he was unable to sleep; that he did not talk to anyone on March 9; that on March 10 he was interrogated by two F.B.I. agents for whom he signed a waiver form; that later that afternoon he was visited by one of the F.B.I. agents and an assistant United States attorney for whom he signed another waiver form; that he was then driven to a river in Gary, Indiana, to show the

law enforcement officers where the gun used to kill the armored truck driver had been thrown; that he pointed to no place in particular in the river; that he was then taken before a magistrate in Hammond, Indiana; that he was extremely sick during this entire period; that he signed papers in the magistrate's office; that he was then taken to the Crown Point, Indiana, county jail; that they stopped en route to get him a hamburger and a coke because the law enforcement officers thought it might relieve his stomach pains and that he tried to eat part of it when he got to his cell; that he did not receive any medical treatment at Crown Point; that a few days later he was taken to LaPorte, Indiana, county jail; that he created a disturbance and the sheriff promised to get a doctor and some methadone; and that eventually a doctor saw him and did not give him methadone but did give him four tablets.

In summary, Gaines testified from the time he started withdrawal on March 8 his symptoms steadily worsened for about five days; that for three or four more days his symptoms leveled off at this most painful stage; that he then began to get better and the habit was kicked in a total of two weeks; and that on March 24 at the preliminary hearing he was completely over withdrawal.

At the suppression hearing, Detective Symeon Colquitt of the narcotics unit of the Gary Police testified that he had known Gaines since grade school; that it was hearsay knowledge that he was a heroin addict; that on March 8, 1972, when Gaines was brought to the police station, he "looked the same" as on previous occasions and that his appearance did not change throughout the day; that after advising Gaines of his rights he talked with him intermittently for three or four hours; and that during the conversation Gaines was responsive, coherent and understandable and did not exhibit symptoms of withdrawal.

F.B.I. Agent Whitaker testified that he had been told Gaines was a heroin addict; that he and Agent Jenkins inter-

viewed Gaines in the afternoon of March 8 for about one-half hour: that Gaines "seemed in control of his physical senses" and "didn't exhibit any of the symptoms which I thought withdrawal would display"; and that when he inquired about his health Gaines answered that he was all right.

Agent Whitaker also testified that he and Agent Wilks interviewed Gaines on the morning of March 10 and that he looked the same as on March 8; that he asked Gaines how he was feeling and was told that he had been sick and had vomited the night before but felt all right then; that he "expected to see symptoms of withdrawal" but didn't observe any and that Gaines talked about the fact that he had used heroin but said he "had stopped using it when he thought the FBI was looking for him"; that Whitaker read and explained the interrogation and advice of rights form and asked Gaines if he understood it; that he asked questions which were answered more fully than with a "yes" or "no"; and that he obtained an oral confession which was not transcribed verbatim or given under oath or signed by Gaines.

Agent Whitaker further testified that in the afternoon of March 10 he introduced Mr. Kieser to the defendant as "the Assistant United States Attorney from South Bend, Indiana . . . the Government's prosecutor"; that prior to transporting Gaines to Hammond, he said he would show the authorities where the guns from the armored car robbery had been thrown; that Whitaker explained to Gaines that this evidence could be used against him in court and Gaines indicated that he understood; that Gaines signed a second interrogation and advice of rights form waiving his right not to incriminate himself; that during the ride Gaines "directed us to the most expeditious route to where the guns were allegedly thrown, and he knew where he was and what he was doing."

F.B.I. Agent Wilks testified that during the interview with Gaines on March

he "carried on the conversation himself, mostly" and his statement was detailed; that he was alert, his speech was clear and he seemed relaxed; and that he knew Gaines used drugs but not to what extent.

Sergeant Cobie Howard of the Gary Police testified that he had known Gaines for about twenty years; that it was his personal opinion that he was a heroin addict; that he saw Gaines on the morning of March 10 and he was understandable and sensible; and that he had not seen Gaines for some time "but the time before I'd seen him there, he was not as clean" as on March 10. Sergeant Howard denied that he had told Gaines that the only way to get medical treatment was to tell the F.B.I. what it wanted to hear.

Detective Sergeant Larry Fishburn of the Indiana State Police testified that he had knowledge that Gaines was a heroin addict; that he rode in the back of the car with Gaines to Hammond and Gaines was intelligible, sensible and coherent; that he had observed the withdrawal of heroin addicts and that he did not observe in Gaines any symptoms of withdrawal; that "we were concerned because of the fact that we had information that he was an addict. . . . I asked him the question had he gone 'cold turkey' before and his answer was, 'three or four times' "; and that Gaines did not ask for medical treatment in his presence.

Assistant United States Attorney Richard Kieser testified that he went with Agent Whitaker to the Gary Police Department on the afternoon of March 10 after he had been told that Gaines had made an oral statement; that he had heard that Gaines had been an addict at different times but that Gaines appeared normal and he "saw nothing unusual in his appearance"; that he vaguely recalled something about medical treatment but he didn't know exactly what was said; and that during the entire afternoon Gaines did not say he was sick but only that he was cold; and that Kieser was told by the F.B.I. that Gaines told them on March 8 that he had not taken heroin for several weeks.

Elmer Chikar of the St. Joseph County Police said he saw Gaines carry a sandwich and a drink into the Crown Point jail on March 10, 1972, and saw him eating and drinking while waiting to be booked.

F.B.I. Agent Robert Radde testified that he first had contact with Gaines in the magistrate's office in Hammond; that he had heard that Gaines was an addict but that he "looked fine"; that he checked with Gaines about four times while he was incarcerated; that after Gaines was moved to LaPorte County Jail he received several calls from the sheriff concerning problems with Gaines including the fact that he wasn't feeling well; and that each time he visited Gaines he was told by him that the "big problem" was not his health but rather his desire to be returned to Crown Point.

Gaines introduced copies of F.B.I. memoranda concerning Agent Radde's visits with Gaines at LaPorte County Jail. The March 15, 1972 memorandum relates that Radde was "advised at this time that he was feeling well and being treated well and was not having any reactions from his heroin addiction." The March 17, 1972 memorandum recites that "at this time Gaines stated he was feeling well and spoke fluently."

The court denied the motion to suppress, stating "the Court does not find that there is any substantial probative evidence that would support [Gaines'] self-serving declarations." In view of the evidence before him, we do not believe that the district court erred in denying Gaines' motion to suppress his oral confession.

The question of the voluntariness of the confession and what weight, if any, to be accorded it were submitted to the jury under proper instructions at the subsequent trial.

## VII

■ Defendants English and Hubbard contended that it was error to deny their motions for severance in view of the introduction of Gaines' oral confession.

The confession was related on the witness stand by F.B.I. Agent Whitaker. Prior to the relation, the district court admonished the jury as follows:

> Ladies and gentlemen of the jury, any statement that this witness might relate as to anything that the defendant Gaines may have told him would not be admissible against any other defendant. It would not be admissible, and might be considered by you only with respect to the defendant Gaines who may have made some statement to this witness.

> Please keep that in mind in the event it should involve anybody else.

In the course of his testimony, Agent Whitaker did not mention any names except Gaines and did not describe nor identify any other person. However, he did state that Gaines "and two other individuals" were involved in the robbery and killing.

In the court's final instructions to the jury, further admonitions were given.[5]

The procedure followed here was precisely the same as we approved in United States v. Gregg, 414 F.2d 943 (7th Cir. 1969), cert. denied, 399 U.S. 934, 90 S.Ct. 2251, 26 L.Ed.2d 806 (1970), where we said as 948–949:

> The Supreme Court in *Bruton* (Bruton v. United States, 391 U.S. 123, 88 S.Ct. 1620, 20 L.Ed.2d 476) in speaking of alternative methods to admit a confession against the confessor without infringing the non-confessor's right of confrontation refers in a footnote (391 U.S. 134), to deleting references to co-defendants. That

was precisely the procedure followed here.

Special F.B.I. Agent John William Davis testified to the oral statement made by the co-defendant after the latter had been advised of his rights. The statement clearly inculpates the co-defendant and an unnamed friend who assisted him in the robbery. In the footnote mentioned, the Court in *Bruton* alludes to the difficulty of relating X's confession without reference to Y and points out the unlikelihood that an accidental slip could be remedied by instructions to disregard.

In this case there was no such slip

. . . .

## VIII

■ Defendants argued that the district judge was prejudiced against them and should have disqualified himself.

We have read the entire record and have found no basis whatever to justify any allegation of bias or prejudice. "The alleged bias and prejudice to be disqualifying must stem from an extrajudicial source and result in an opinion on the merits on some basis other than what the judge learned from his participation in the case." United States v. Grinnell Corp., 384 U.S. 563, 583, 86 S.Ct. 1698, 1710, 16 L.Ed.2d 778 (1966). "Rulings and findings made by a judge in the course of a judicial proceeding are not in themselves sufficient reasons to believe that the judge has a personal bias or prejudice for or against a party." United States v. Amick, 439 F.2d 351, 369 (7th Cir.), cert. denied, 403 U.S. 918, 91 S.Ct. 2227, 29 L.Ed.2d 694 (1971).

## IX

Finally, the defendants briefly listed a catalogue of alleged trial errors without

5. The court instructed the jury in part as follows:

"A confession, if you find it to be true and voluntary, constitutes evidence only against the person making it. It must not be considered as evidence against a codefendant and must be disregarded by the jury in determining the guilt or innocence of a codefendant. Nor is any inference of guilt to be drawn against any codefendant from the fact of their presence at this trial as codefendants with each other."

any argument in support of those supposed errors and without indicating the context in which they occurred or what surrounding facts allegedly rendered them prejudicial to the defendants. Nevertheless we have examined them all and find them to be without merit.

The convictions are affirmed.