CRANMORE, and others, Plaintiffs in error, v. STATE, Defendant in error.†

Court of Appeals, District I

No. 77–384–CR. *Argued August 9, 1978.—Decided October 2, 1978.* (Also reported in 271 N.W.2d 402.)

---

† Petition to review denied.

724

For the defendant in error, the cause was argued by *Pamela Magee-Heilprin*, assistant attorney general, with whom on the brief was *Bronson C. La Follette*, attorney general.

For the plaintiffs in error, there were briefs and oral argument by *Melvin F. Greenberg* on behalf of plaintiff Cranmore, *Mark Lukoff* on behalf of plaintiff Rolf, assistant public defenders and *Dominic H. Frinzi* on behalf of plaintiff Rogers, with whom on the briefs was *Howard B. Eisenberg*, state public defender.

Before Decker, C.J., Cannon, P.J., and Moser, J.

DECKER, C.J. These criminal actions arose from the same incidents, were tried together, present numerous identical issues on appeal and were, therefore, consolidated for appeal purposes.

The three plaintiffs in error (hereinafter defendants), Robert Allen Cranmore, Brian Curtis Rolf and Patrick Rogers (the fourth defendant who is referred to in the opinion, Robert Prihoda, escaped from custody subsequent to his commitment to the Wisconsin State Prison System and is not a party to this appeal) were convicted by a jury of one count of first-degree murder, contrary to secs. 940.01 and 939.05, Stats. In addition, Rogers and Cranmore were convicted of four counts of armed robbery, contrary to secs. 943.32(1)(b) and (2), and 939.05, Stats. Rolf was convicted of three counts of armed robbery by the jury, having entered a guilty plea to an additional count prior to the commencement of testimony. Rogers and Rolf were found to have been masked so as to make it less likely that they would be identified during the commission of the crime, contrary to sec. 946.62, Stats.

Each defendant was sentenced to life imprisonment for conviction of first-degree murder (count one). For the first armed robbery (count two) each defendant was sentenced to an indeterminate term of not more than thirty years, that sentence to be served consecutive to the sentence imposed for murder. Rolf and Rogers were sen-

tenced to an additional five-year term, to be served consecutive to the thirty-year term, for concealing their identity. On the next two armed robbery counts (counts three and four), defendants were sentenced to a term not to exceed thirty years, to run concurrently with the sentence imposed in count one; Rolf and Rogers were ordered to serve an additional five years consecutive to the sentences in counts three and four for concealing their identity. Finally, on the last armed robbery (count five), the defendants were sentenced to an indeterminate term not to exceed thirty years, consecutive to the sentence imposed in count two, Rolf and Rogers receiving the additional five years to be served consecutively to the term imposed in count five.

All postconviction motions were denied and the defendants brought writs of error to review the judgment of conviction and orders denying postconviction motions.

The trial of the defendants produced over five thousand pages of transcript. Although the evidence was clearly sufficient to establish the defendants' participation in this incident, the following is a brief overview of the central testimony.

These appeals arise out of the armed robbery of Bryant's Cocktail Lounge in the early morning hours of August 17, 1975. Bryant's is a two-story drinking establishment located on the corner of Ninth Street and Lapham Street in Milwaukee. There are bars located on both the upper and ground floors with tables and chairs for the patrons on both floors. The establishment may be entered or exited either from Lapham Street or from Ninth Street; the latter apparently is the main entrance. When entering from Ninth Street, one proceeds into a vestibule from which a number of steps and a glass door provide entry to the downstairs lounge. Immediately to the right upon passing through the glass door leading to the lounge is the stairway leading to the upstairs lounge.

During the course of this robbery, a number of bar patrons were robbed (the defendants were charged with the armed and masked robbery of three bar patrons and of Bryant's itself), two patrons were wounded by gunfire and off-duty Milwaukee police officer Dennis O'Bradovich was shot to death (Dennis O'Bradovich's name is also spelled Obradovich in various parts of the transcript).

One of the primary witnesses for the state was Vera Tuitczenko, an admitted accomplice of the defendants. In August, 1975 Tuitczenko, a juvenile runaway, was living with Rogers in Milwaukee. At the time she left home she took with her, and subsequently gave to Rogers, a .22 caliber Arminius revolver. The revolver was loaded with .22 caliber long rifle shells manufactured by Sears and Roebuck. Tuitczenko testified that on August 16, 1975 while she and Rogers were having lunch, he announced his intention to "hold up" Bryant's. Later that day she accompanied Rogers to Bryant's so that he could see the interior, but they were refused service because Rogers was not properly attired. They returned to another bar where they had seen Cranmore and Prihoda earlier. Cranmore and Prihoda conversed with Rogers out of earshot of Tuitczenko. From there she drove the three to Rogers' residence where they changed clothing and she, on directions from Rogers, retrieved an automatic handgun from the bedroom, turning it over to Rogers. Tuitczenko then drove the three in Rogers' car toward Bryant's while Rogers, Cranmore and Prihoda discussed robbing it. Upon arrival, however, Prihoda insisted that it was "too risky" and all four returned to the Seventh House Bar where Rolf was recruited.

Cranmore, Rogers, Rolf, Prihoda and Tuitczenko then drove back to Bryant's where Tuitczenko dropped them off and was told to wait in a nearby alley. During the ride between the Seventh House Bar and Bryant's Lounge, all the defendants discussed the holdup and Rogers gave directions regarding the various defendants' ac-

tivities inside the bar. Prihoda and Cranmore were to go to the upstairs lounge, Rolf and Rogers were to go to the downstairs lounge, with Prihoda and Rolf acting as "runners."

After waiting in the designated alley a short while, Tuitczenko heard gunshots coming from the vicinity of Bryant's. She started the car and drove back in the direction of Bryant's until she saw Cranmore, who told her to "get out of here."

After Tuitczenko had testified to the foregoing events, she was later recalled to the stand and testified to Cranmore's statement to her that when he had come upon Dennis O'Bradovich while leaving Bryant's he aimed his gun at O'Bradovich's head and emptied the gun and, he thought he had killed him.

The state then produced a number of witnesses as to what transpired inside Bryant's Lounge, including the robberies of the victims with which the defendants were charged.

Cranmore and Prihoda were both identified as being upstairs, both were armed and both threatened the life of one or more patrons, one stating to a patron: "Keep your head down or I'll blow it off."

Rogers and Rolf were both identified as being in the downstairs lounge and carrying weapons. They both threatened the lives of patrons, either verbally or by placing their weapons in close proximity to a vital part of the body of a patron. Rolf forced one of the bartenders to empty the cash from one of the cash registers into a white pillow case. The bartender estimated that $500 had been in the cash register.

The other primary witness for the state was Milwaukee police officer Gerald Drefahl. He testified that he was Dennis O'Bradovich's partner on the police force. On that evening he and O'Bradovich had been out with O'Bradovich's parents and fiancee celebrating O'Brado-

vich's recent engagement. After leaving O'Bradovich's parents, Drefahl and his date and O'Bradovich and his fiancee proceeded to Bryant's. They were seated for a short time in a booth when Drefahl noticed a man wearing a blue ski mask over his face and waving an automatic handgun come into their section of the bar. They were ordered at gunpoint to the front of the bar and were told to lie facedown on the floor.

After they had complied, Drefahl observed Officer O'Bradovich remove his revolver from the purse of his fiancee and crawl to a position in front of the door leading to the vestibule. Drefahl followed him. Having reached this position, Officer O'Bradovich began to raise himself up, looking in a south-southwesterly direction. He then made an abrupt swing to the southeast where a figure with a mask was standing. Officer O'Bradovich fired two rounds from his revolver at the figure and there was a return of fire, three shots if not more, one of which wounded O'Bradovich in the leg. O'Bradovich fired one more shot and rolled backwards through the door and into the vestibule.

Officer Drefahl then returned to the position where his date and Dennis O'Bradovich's fiancee were lying. He informed them that he was going outside and began to move toward the vestibule door. However, he heard someone running down the stairs and looked up to see Cranmore firing into the crowd in the downstairs lounge. There was another person behind Cranmore, but Drefahl was unable to see him. The gun that Cranmore was firing sounded as though it was a smaller caliber than a .38.

There was a brief pause in the firing and Drefahl heard someone say: "I am shot, help me up. Let's get out of here"; that voice came from the southeast corner of the bar. Drefahl then observed three people at the door leading to the vestibule, one of whom was Cranmore. As they opened the door leading to the vestibule, three

shots rang out; the sound was consistent with the earlier firing of Dennis O'Bradovich's .38 caliber revolver. As those shots were fired, Drefahl observed all of the defendants lie prone on the top step in the vestibule.

After the three shots had been fired, Drefahl observed one of the defendants standing on the top step firing down into the vestibule. He heard numerous shots being fired, but the sounds were not consistent with the firing of O'Bradovich's gun. After the last barrage of firing ceased, Drefahl proceeded outside and observed Dennis O'Bradovich lying on the sidewalk, bleeding from his head. He also observed a number of police officers who had responded to the silent alarm triggered by the downstairs bartenders when they first observed the robbers entering.

Rolf and Rogers were arrested just outside Bryant's. Rolf was in possession of a .25 caliber revolver and a sack containing $378 and various items belonging to patrons of the bar. Rogers was shot when he refused to heed a police officer's command that he stop. A .32 caliber automatic handgun was found in his immediate vicinity, along with a number of items which were identified as belonging to patrons of Bryant's. Prihoda and Cranmore were arrested a number of hours later.

O'Bradovich was conveyed to Milwaukee County General Hospital where he received extensive medical care, including two craniotomies performed by Dr. Joseph Cusick to relieve the pressure created in the skull caused by the gunshot wound to the officer's brain. His heartbeat, respiration and blood pressure were maintained by artificial means until the midmorning hours of August 18, 1975. At that time, the attending physicians decided to seek permission from Dennis O'Bradovich's parents to remove his kidneys for purposes of transplantation. Having received permission, a nephrectomy was performed, artificial aids to respiration and blood pres-

sure were discontinued, and, at 4:14 p.m., all evidence of pulmonary activity was absent.

Dr. Chesley Erwin, the Milwaukee County Medical Examiner, was called by the state. He testified that, although Dennis O'Bradovich had been wounded ten times, the cause of death was a bullet wound to the skull, the slug entering the brain and traveling almost entirely through it.

Monty Lutz, a firearms expert with the Wisconsin State Crime Laboratory, identified various pieces of physical evidence located at the scene and also examined the two slugs which were recovered from Dennis O'Bradovich's body. (In addition to the fatal slug recovered from his brain, a slug was recovered from the area of his shoulder blade.) The slugs were identified as being from .22 caliber long rifle ammunition and they were consistent with ammunition manufactured by the Sears and Roebuck Company. Lutz also testified that his testing of the ammunition indicated that the markings on the slugs, resulting from passage through the barrel of the gun, were consistent with their having been fired from an Arminius .22 caliber revolver.

Further facts will be referred to in the relevant portions of this opinion.

## I.

### PRELIMINARY EXAMINATION

The defendants have asserted that insufficient evidence was adduced at the preliminary examination to support a finding of probable cause and bindover of the defendants to the circuit court for trial on the charge of first degree murder, party to a crime.

The purpose of a preliminary examination is to determine whether there is probable cause to believe that

a felony has been committed by the defendant.[1] Stated another way, the magistrate must find that the state has adduced suffficient evidence to establish a reasonable probability that a felony has been committed by the defendant.[2] If the evidence is insufficient to meet that standard, the defendant is discharged or any count for which no such finding is made is dismissed.[3] The preliminary examination provides "an expeditious means for the discharge of an accused if it does not appear probable that he has committed the crime or crimes for which he is held."[4] However, the state need not establish its case beyond a reasonable doubt to hold the accused for trial.[5]

In reviewing the determination by a magistrate that probable cause existed, a court can only examine the evidence:

sufficiently to discover whether there was any substantial ground for the exercise of judgment by the committing magistrate. When the reviewing court has discovered that there is competent evidence for the judicial mind of the judicial magistrate to act on in determining the existence of the essential facts, it has reached the limit of its jurisdiction and cannot go beyond that and weigh the evidence.[6]

Based upon our independent review of the record, we conclude that the magistrate, in considering the "prac-

---

[1] Sec. 970.03(1), Stats.

[2] *State v. Olson,* 75 Wis.2d 575, 584, 250 N.W.2d 12 (1977).

[3] Sec. 970.03(9) and (10), Stats.

[4] *State ex rel. Klinkiewicz v. Duffy,* 35 Wis.2d 369, 373, 151 N.W.2d 63 (1967).

[5] *State v. Berby,* 81 Wis.2d 677, 684, 260 N.W.2d 677 (1978).

[6] *State ex rel. Hussong v. Froelich,* 62 Wis.2d 577, 583, 215 N.W.2d 390 (1974).

tical and nontechnical probabilities of everyday life,"[7] was correct in finding that there was a reasonable probability that the defendants committed the crime of first-degree murder, party to a crime. We base this conclusion on the following evidence which was before the magistrate when he made the probable cause determination:

1. All of the defendants had participated in discussions regarding the robbery of Bryant's Lounge. The discussions anticipated the use of handguns.

2. Two of the defendants involved in this appeal were identified as being present in the bar and brandishing handguns immediately preceding the commencement of gunfire.[8]

3. Dennis O'Bradovich was seen in the bar in good health and complying with the commands of the defendants less than five minutes before his body was found outside of the bar.

4. At least two of the defendants, who were armed, were still in the bar at the time the firing commenced.

5. Dennis O'Bradovich was found almost immediately in front of the exit from which the defendants emerged, making it clear that they encountered O'Bradovich in attempting to escape.

6. Ten bullets were fired into the body of Dennis O'Bradovich including a wound to the head, a wound

[7] *Taylor v. State*, 55 Wis.2d 168, 172–73, 197 N.W.2d 805 (1972).

[8] The only defendant who was not identified as being present in Bryant's was Patrick Rogers. However, Vera Tuitczenko testified that she dropped off all of the defendants a short distance from Bryant's and they all headed toward the bar together. A few moments later she heard gunshots coming from the vicinity of the bar. She also testified that the original plan to rob the bar was formulated by Patrick Rogers and that shortly before the defendants left the car, Patrick Rogers was giving directions as to what actions were to take place inside.

to the jaw, a wound to the neck and a wound in the abdomen.

7. The defendants abandoned their plan to escape from the area in two cars. The two getaway drivers left the area without the other defendants.

While the state had available to it evidence which was more probative regarding the charge of first degree murder, we believe that the evidence adduced constituted substantial ground for the "exercise of judgment by the committing magistrate." We therefore hold that the circuit court had jurisdiction over the defendants with regard to the charge of first-degree murder, party to a crime.[9]

## II.

### SEVERANCE

The defendants maintain that the trial court committed prejudicial error in refusing their repeated requests that their trials be severed pursuant to sec. 971.12(3), Stats.[10] They state the following bases to support their contention that it was prejudicial error to try them jointly:

1. Two of the defendants, Prihoda and Rolf, pleaded guilty to the armed and masked robbery of Bryant's

[9] We reach the question of whether the defendants' actions caused the death of Dennis O'Bradovich in a later section of this opinion. For that reason, although the defendants raised the issue with regard to a finding of probable cause, we do not address it here.

[10] The provisions of sec. 971.12(3), Stats., are set out at p. 21, *infra*.

prior to the commencement of the trial. Counsel for these defendants made reference to that fact in their opening statement.[11]

2. Two witnesses for the state, Vera Tuitczenko and Oliver Brenwall, were permitted to testify to inculpatory statements of individual defendants made after the robbery and shooting had occurred and the defendants had fled from the scene. The testimony was received pursuant to cautionary instructions to the jury to consider the statements only as evidence against the defendant to whom they were attributed. Prior to the admission of the statements, the trial court also ordered that all references to any defendant other than the declarant be stricken from the statement. Cross-examination regarding those statements was also ordered limited in that fashion.

3. Vera Tuitczenko testified regarding statements made by Rogers during the early afternoon hours of August 16, 1975, regarding the proposed robbery of Bryant's. These statements were made prior to the time that Rogers had contacted any of the other defendants regarding their possible participation in this offense.

4. Defendants maintain that they asserted antagonistic defense theories. They point to the closing arguments of the various defense counsel as demonstrating that each was attempting to place the blame for the actual shooting of Dennis O'Bradovich on the other defendants, thereby exculpating his client.

Timely motions for severance were interposed by defense counsel as the various bases asserted became evident. We deal with each of the bases separately.

---

[11] The brief of the defendants indicates that counsel for only one of the defendants made reference to the guilty plea. Our reading of the record reveals that, in fact, counsel for both Rolf and Prihoda made such references in their opening statement and closing argument.

## A.

### GUILTY PLEAS OF ROLF AND PRIHODA

After the impaneling of the jury and before testimony was taken, defendants Rolf and Prihoda entered pleas of guilty to the second count of the information, the armed and masked robbery of Bryant's Lounge. Rogers and Cranmore moved for severance of their trials but the motion was denied, the trial court finding that the defense theories had not been shown to be sufficiently antagonistic so as to warrant severance.

In both their opening statements and closing arguments, counsel for Rolf and Prihoda made reference to the pleas of guilty which had been entered by their individual clients. The record reflects that the trial court was informed that such references would be made prior to the opening statements.

Section 971.12(3), Stats., governs severance where a defendant demonstrates that he is prejudiced by "joinder for trial together." Cranmore and Rogers assert that the guilty pleas and reference to them before the jury was prejudicial to their defense in that: "[F]rom the very beginning of the trial, at least two of the defendants were placed at the scene of the robbery prior to any testimony, clearly a detriment to the non-guilty (sic) plea of defendants Rogers and Cranmore."[12] The only prejudice asserted then is that the guilty pleas were utilized by the state to create an inference of Cranmore's and Rogers' presence in Bryant's Lounge during this offense.

It is improper for the state to introduce a guilty plea of a codefendant to establish the guilt of a remaining

---

[12] Defendant's Brief at 27.

defendant.[13] As to the remaining defendant, the plea constitutes inadmissible hearsay.[14]

The prejudicial effect of the introduction of a co-defendant's guilty plea,[15] however, may be found to be harmless error where the independent evidence adduced at trial is found to be overwhelming on the question of guilt.[16] Our reading of the record discloses overwhelming independent evidence of Rogers' and Cranmore's presence at Bryant's on the night in question. Rogers was arrested immediately outside of the bar after he was felled by a policeman's bullet while running from the establishment. The testimony of Vera Tuitczenko, Fred Winkler and Gerald Drefahl, among others, place Cranmore in Bryant's.[17] In addition, we note that counsel for Rogers and Cranmore considered the evidence of their clients' presence and their participation in the armed robbery of Bryant's overwhelming. In closing arguments, both counsel informed the jury of

[13] *United States v. Bryza*, 522 F.2d 414, 425 (7th Cir. 1975), *cert. denied*, 426 U.S. 912 (1976). Note, however, that a co-defendant's guilty plea may be divulged for purposes of impeachment, to reflect on a witness' credibility, to explain the conspicuous absence of a codefendant who has pleaded guilty during the course of the trial. *See also Virgil v. State*, 84 Wis.2d 166, 183, 267 N.W.2d 852 (1978).

[14] *Id.*

[15] Assuming, *arguendo*, that in this instance it was found to be in error.

[16] *United States v. Zarattini*, 552 F.2d 753 (7th Cir. 1977), *cert. denied*, 431 U.S. 942 (1977); *United States v. Jones*, 540 F.2d 465 (10th Cir. 1976), *cert denied*, 429 U.S. 1101 (1977); *United States v. Smith*, 550 F.2d 277 (5th Cir. 1977), *cert. denied*, 434 U.S. 841; *Carter v. United States*, 281 F.2d 640 (D.C. Cir. 1960), *cert. denied*, 364 U.S. 880 (1960).

[17] In *Harrington v. California*, 395 U.S. 250 (1969), the United States Supreme Court found that the confessions of codefendants introduced in violation of *Bruton v. United States*, *infra*, which placed the defendant at the scene, was cumulative to other evidence establishing that fact and was therefore harmless error.

their belief that the evidence established their clients' presence at, and participation in the robbery of, Bryant's Lounge.

Since Rogers and Cranmore, in effect, admitted the truth of Prihoda's and Rolf's guilty pleas and "made them [their] own," they cannot now be heard to assert that they were prejudiced by the jury's knowledge of the pleas.[18]

Defendants maintain that this case is controlled by *United States v. Harrell,* 436 F.2d 606 (5th Cir. 1970). They assert that the state, in refusing to sever the trials, deliberately used the guilty pleas of Rolf and Prihoda to prove the guilt of the remaining defendants. We find no similarity between the situation addressed in *Harrell* and that which we address. In this instance, the pleas of guilty were brought to the attention of the jury only by momentary reference to them in the opening statements and closing arguments of counsel for Prihoda and Rolf. There was no calculated use of the guilty pleas by the state; to the contrary, the record reflects that the state objected to the limited references which were made.

We hold that the trial judge was correct in refusing to sever the trials of the defendants on this basis.

B.

*TESTIMONY OF VERA TUITCZENKO AND OLIVER BRENWALL REGARDING INCULPATORY STATEMENTS OF CRANMORE AND PRIHODA SUBSEQUENT TO THE INCIDENT*

Vera Tuitczenko was permitted to testify regarding a statement of Robert Cranmore made to her after the

[18] *Novkovic v. State,* 149 Wis. 665, 672, 135 N.W. 465 (1912).

shooting and his escape from the scene. The substance of the statement was to the effect that Cranmore had come upon Dennis O'Bradovich lying on the ground, that he aimed his gun at O'Bradovich's head and emptied his gun and, he believed that he had killed him. It was stipulated between the state and defense that at the time this statement was made, defendants Rogers and Rolf had been taken into custody by Milwaukee police officers.

Oliver Brenwall testified that sometime in the late evening on August 17, 1975, or early morning on August 18, 1975, he was approached by Robert Prihoda who asked to speak to him privately. Brenwall testified that he accompanied Prihoda outside the bar in which he (Brenwall) had been drinking, whereupon Prihoda informed him (Brenwall) that the Milwaukee police were looking for him (Prihoda) and he requested that Brenwall provide an alibi for him. Brenwall stated that he refused and returned to the bar. It is clear from the transcript that Rolf and Rogers were in custody at the time Prihoda's statement was made.

The testimony of Vera Tuitczenko was offered first. The defense asserted that the statement did not constitute a nonhearsay admission, sec. 908.01(4)(b)5, Stats., because it was made neither during the course of the conspiracy, nor in furtherance thereof. According to the defendants, the statement was inadmissible hearsay as to any defendant other than Cranmore. It was further argued that admission into evidence of the statement would have a prejudicial "spillover" impact on the jury, which could not be remedied by an instruction limiting the jury's consideration of the statement only to its determination of the guilt or innocence of Cranmore. According to the defendants' theory, to admit such a statement in a joint trial would be to deny the remaining defendants due process of law. They cite

*Bruton v. United States,* 391 U.S. 123 (1966), to support this assertion.

The trial court found that the statement was inadmissible hearsay as to the defendants other than Cranmore[19] and initially ruled that its admission would violate the principle of *Bruton.* Subsequently, however, the court reevaluated its ruling and admitted the statement with all references to defendants other than Cranmore deleted.[20] The court also directed that cross-examination of the witness regarding the statement was to be limited so as to avoid any reference to the remaining defendants. Defendants moved for severance and the motion was denied. The trial court cautioned the jury that if they believed the testimony of Tuitczenko regarding the statement to be true, they were to consider it as evidence only against Cranmore and not against any other defendant.

The following testimony was then offered on behalf of the state over the hearsay objections of all of the defendants except Cranmore:

Q. Miss Tuitczenko, did there come a time early in the morning of August, well, shortly after day-time on the morning of August 17th, of 1975 that you had a conversation with Robert Cranmore?
A. Yes.

. . . .

[19] Despite arguments of the State at trial to the contrary, this Court is in full agreement with the finding that sec. 908.01(4)(b) 5, Stats., was inapplicable. The statement was not "in furtherance of" the conspiracy, nor "during its course." See McCormick, *Evidence,* 2d ed., p. 646; *Krulewitch v. United States,* 336 U.S. 440 (1949). Compare *Dutton v. Evans,* 400 U.S. 74 (1970), interpreting a far more expansive Georgia statute.

[20] We have been unable to locate in the record the entire statement originally attributed by Tuitczenko to Cranmore. However, the record does indicate that two of the other defendants were implicated.

Q. And at that time did Mr. Cranmore relate to you things that he had done concerning the incident earlier?
A. Yes, he did.

. . . .

Q. What did he tell you at that time about what he did?

. . . .

A. He said that he was upstairs of Bryant's (sic) and he heard shots, so he ran downstairs and after he got outside, there was a man lying on the ground, and he said that he shot him and that he emptied his gun.
Q. Did he say where he shot him.

. . . .

A. He said he aimed for his head.[21]

As we have pointed out, this testimony was inadmissible hearsay as to Rogers, Rolf and Prihoda. Equally as clear, however, is the fact that the statement was admissible as to Cranmore under sec. 908.01(4)(b)1, Stats. Therefore, the trial judge was authorized by statute to admit the evidence for that limited purpose under sec. 901.06, Stats.[22] However, the statute cannot be applied in a fashion which violates the constitutional rights of the other defendants. We turn then to the question of whether the admission of this statement in the joint trial of these defendants constituted a violation of the rule enunciated in *Bruton v. United States, supra.*[23]

In *Bruton,* the United States Supreme Court stated that the admission into evidence of a statement by one

[21] The same legal arguments and objections were made and the same result obtained regarding the statement attributed to Prihoda by Brenwall. Our discussion of the law relevant to the admissibility of the Cranmore statement applies to the admissibility of the Prihoda statement as well.

[22] Later in this opinion we discuss the authority to receive the evidence for a limited purpose in the light of sec. 971.12(3), Stats.

[23] The *Bruton* rule was made retroactive and applicable to the states in *Roberts v. Russell,* 392 U.S. 293 (1968).

defendant, implicating a codefendant in that trial, where the declarant exercised his fifth amendment privilege not to testify was constitutionally impermissible. The court held that the declarant became, in substance, a witness against the codefendant—a witness against whom he was denied the constitutional right of confrontation due to the declarant's fifth amendment privilege. In overruling *Delli Paoli v. United States,* 352 U.S. 232 (1957), the court held that the constitutional violation could not be avoided by instructing a jury that the statement could only be considered as evidence against the declarant/defendant.

The basic premise of *Delli Paoli* was that it was "reasonably possible for the jury to follow sufficiently clear instructions to disregard the confessor's extrajudicial statement that his codefendant participated with him in committing the crime. . . . [T]his court has effectively repudiated [this] basic premise." *Bruton, supra,* at 126.

What the *Bruton* decision did *not* mandate is that in every instance in which a defendant confesses and implicates another defendant that the statement cannot be used at trial or the defendants must be tried separately.[24] The Court stated that there were alternative ways for the state to avail itself of the benefit of the confession in proving the confessor's guilt without abridging the codefendant's right to confront witnesses against him. One of the ways to which the Court referred was deletion of all references in the statement to any other defendant who was being tried jointly.[25] This procedure for avoiding the prejudicial effect on an implicated co-

[24] This rule was suggested in *Delli Paoli v. United States,* 229 F.2d 319, 324 (2d Cir. 1956) (Frank, J., dissenting). Although the Court made specific reference to it, the rule was not adopted.

[25] *Bruton, supra* at 132, n. 10. Although the Court expressed some concern that the witness in recounting the statement on the

defendant had been previously approved by the Court in *Malinski v. New York,* 324 U.S. 401, 411–12 (1945).

Subsequent decisions of the federal circuit courts of appeal have established that if references to codefendants are "effectively" excised and the jury is properly instructed, no *Bruton* violation occurs.[26] As was stated in *United States v. Sacco:*[27] "For *Bruton* to apply, the statements of a nontestifying codefendant must be 'clearly inculpatory' as to the complaining codefendant and [be] vitally important to the government's case.' "

We believe that the references to the remaining codefendants were "effectively" excised and the jury was properly instructed. The statements introduced did not in fact inculpate the remaining defendants. The only claimed prejudice is that a codefendant's confession, inculpating only himself, was introduced at a joint trial. *Bruton* does not require the state to try defendants separately in every instance in which an inculpatory statement of one is introduced at trial. We therefore hold that the procedure utilized at this trial did not violate the mandate of *Bruton.*

There have been numerous legislative responses to the *Bruton* decision.[28] The Wisconsin legislature is included in the number of legislative bodies which have enacted a

stand would "slip" and refer to a codefendant, we note that there was no "slip" of any kind in the testimony of Tuitczenko or Brenwall regarding the statements. See *United States v. English,* 501 F.2d 1254 (7th Cir. 1974), *cert. denied,* 419 U.S. 1114 (1975).

[26] *See, e.g., United States v. Alpern,* 564 F.2d 755 (7th Cir. 1977); *United States v. English, supra; United States v. Blasseck,* 422 F.2d 652 (7th Cir. 1970), *cert. denied,* 402 U.S. 985 (1971); *United States v. Sacco,* 563 F.2d 552 (2d Cir. 1977), *cert. denied,* 434 U.S. 1039.

[27] *Supra* at 556.

[28] *See, e.g.,* F.R. Cr. P. 14; Ind. Code §35–3.1–1–11.

statutory mechanism to carry out the mandate of *Bruton.*
Section 971.12(3), Stats., provides:

> *Relief from prejudicial joinder.* If it appears that a
> defendant or the state is prejudiced by a joinder of
> crimes or of defendants in a complaint, information or
> indictment or by such joinder for trial together, the
> court may order separate trials of counts, grant a
> severance of defendants or provide whatever other re-
> lief justice requires. The district attorney shall advise
> the court prior to trial if he intends to use a statement
> of a codefendant which implicates another defendant
> in the crime charged. Thereupon, the judge shall grant
> a severance as to any such defendant.

The legislative committee note regarding this statute
states: "Sub. (3) is taken from F.R. Cr. P. 14 and in
addition, provides a mechanism to insure that trials
will be conducted in conformity with *Bruton v. United
States,* 391 U.S. 123, 88 Sup. Ct. 1620, which prohibits
the use at a trial of a statement by a codefendant which
implicates another defendant." Having concluded that
the procedure utilized in this trial is consistent with the
mandate of *Bruton,* we now determine whether this pro-
cedure is warranted by sec. 971.12(3), Stats.

Defendants have not argued in this court that the statu-
tory language of this section requires severance of
defendants in all instances in which law enforcement
authorities possess a statement by a codefendant impli-
cating another defendant. We do not believe such an
argument would be viable. The legislative committee note
indicates that the statute is intended to provide a
mechanism to insure compliance with *Bruton.* As we
have stated, compliance may be had with *Bruton* by
*effectively* excising any reference implicating a code-
fendant and by instructing the jury as to the limited
purpose for which the evidence is admitted. If this is
done, the statement no longer "implicates another de-
fendant" and therefore does not fall within the prohibi-

tion of the statute.[29] The legislative committee note also indicates that this statutory provision is taken from F.R. Cr. P. The procedure utilized in this trial is authorized by that statutory provision.[30]

The Judicial Council Committee's Note—1974 appended to sec. 901.06, Stats., which permits introduction of evidence which is admissible for only limited purposes or only as to one party, states: "S. 971.12(3) provides for separate trials or severance *or other appropriate relief* if a confession implicates a codefendant." (Emphasis supplied.) We believe that the "other appropriate relief" referred to is the deletion of implicating references and that the procedure utilized at this trial was warranted under secs. 971.12(3) and 901.06, Stats.

Defendants have argued that introduction of even the limited portion of the statement of Cranmore in this instance, where the defendants were being tried as parties to a crime, could have caused some degree of confusion in the minds of the jurors as to what evidence could be considered as to each defendant. The statement of Cranmore testified to by Vera Tuitczenko was, at the very least, probative as to the question of intent under sec. 940.01, Stats. The trial court instructed the jury that the statement could only be considered as evidence against Cranmore. However, the court also instructed the jury regarding the provisions of sec. 939.05, Stats., parties to a crime. Defendants maintain that the jury may have been confused by these two instructions and may have utilized the statement of Cranmore to find that the remaining defendants intended to kill Dennis O'Bradovich, even though references to

[29] We acknowledge that there will be instances in which implicating references cannot be effectively excised. In such instances, if the state insists upon utilizing the statement, the trials must be severed. That is not the situation here.

[30] *See* cases cited in n. 26, *supra*.

those defendants had been excised. Therefore, they maintain that this "spillover effect" violates the principle of *Bruton*.

We have combed the transcript and record of this proceeding and agree that giving these two instructions to the jury could have confused the jury and caused some spillover effect on the issue of intent. We therefore caution trial judges to be alert to the potential for contradiction between a party to a crime instruction and a limiting instruction. Necessarily, the potential for contradiction must be considered as early in the proceedings as a determination is made with respect to severance.

Our extensive examination of the record, however, also compels us to conclude that any spillover effect as to the question of intent which may have occurred was harmless error beyond a reasonable doubt.[31] We believe that the evidence of intent as to Rogers and Rolf was overwhelming. The record establishes that Rogers entered Bryant's with a deadly weapon for the purpose of robbing the establishment and its patrons. When fired upon by Officer O'Bradovich (shortly after Rogers had placed his weapon to the head of one of the patrons), he did not choose to withdraw; rather he shot Officer O'Bradovich, striking him in the leg and forcing the officer to retreat into the vestibule. After Rogers was wounded, he again chose not to withdraw, but rather sought assistance from his accomplice, one of whom had emerged from the upstairs firing randomly into a crowd of patrons. Rogers permitted his accomplices to lead him out the very door through which the wounded O'Bradovich retreated and where he could expect fur-

---

[31] *See Schneble v. Florida*, 405 U.S. 427 (1972) in which the United States Supreme Court found that not every violation of *Bruton* constituted reversible error. The Court in that case found the admissible evidence to be overwhelming. See also *Harrington v. California, supra.*

ther resistance from the officer to prevent the escape. Rogers certainly had every reason to believe, on the basis of the wild shooting moments before, that his trigger-happy accomplice would meet any resistance with further gunfire. We must conclude that any reasonable jury could only conclude that Rogers fully intended exactly that which happened—the tragic death of Dennis O'Bradovich.

The record establishes that Rolf entered Bryant's armed with a deadly weapon for the purpose of robbing the establishment and its patrons. After he had placed his weapon in the rib cage of one of the victims, he heard the first exchange of gunfire and instead of withdrawing, as he had the opportunity to do, he rushed to the aid of Rogers. After Cranmore had completed his barrage of random firing into the downstairs crowd, Rolf and Rogers were led by Cranmore out the door through which the wounded officer, from whom they could expect further resistance, had moments before retreated. Although Rolf was not firing his own weapon, obviously because he was assisting Rogers with one hand and carrying a sack containing in excess of $350 in the other, he followed Cranmore out this door where Cranmore, consistent with his actions just moments before, repeatedly fired his weapon at Dennis O'Bradovich. The conclusion that Rolf intended the death of the officer is inescapable.[32]

We therefore hold that the procedure utilized in this trial was consistent with the principles of the *Bruton* decision and with the provisions of secs. 971.12(3) and 901.06, Stats. We further hold that any prejudice which may have resulted to Rogers and Rolf because the limiting instruction as to the Cranmore statement was com-

[32] *Accord: Pollack v. State*, 215 Wis. 200, 214, 253 N.W. 560 (1934), *affd on rehearing*, 254 N.W. 471 (1934).

bined with instructions on the party to a crime statute was harmless error beyond a reasonable doubt.[33]

## C.

### TESTIMONY OF TUITCZENKO REGARDING STATEMENTS OF ROGERS DURING THE AFTERNOON HOURS BEFORE THE ROBBERY

At trial, Tuitczenko testified regarding certain conversations that she had with Rogers commencing shortly after 12 o'clock noon on August 16. Included in this testimony were statements inquiring as to whether Tuitczenko had ever been in Bryant's Lounge and what the physical layout of the lounge itself was. Rogers also stated his intention to "hold it up." Tuitczenko, in response, informed him that the bar had two levels and gave him some general information regarding the interior design. This testimony was admitted over the hearsay objections of counsel for all of the defendants except Rogers. Tuitczenko also testified that later, in the early evening, Rogers informed her that they were going to Bryant's because he wanted to see what the inside of it looked like. She drove him there but they were refused service because Rogers was not properly attired. Finally, she testified that after Rogers, Prihoda and Cranmore had conversed out of her hearing for a brief time in the Seventh House Bar, she drove Rogers, Prihoda and Cranmore to Rogers' residence where two of the defendants changed their clothes. At that time, she said, Rogers asked her to get a gun from the bedroom. Defense counsel objected to the testimony regarding the request that she retrieve the gun on the ground of hearsay.

---

[33] *Schneble v. Florida, supra.*

Defendants maintain that this testimony was hearsay as to all defendants except Rogers because there was, at the time of these statements, no conspiracy in effect. Therefore, the statements did not fall within the provisions of sec. 908.01(4)(b)5, Stats., as a statement of a coconspirator made during the course of and in furtherance of the conspiracy.

Defendants assert that, if the statements were inadmissible hearsay as to all of them except Rogers, they were entitled to severance because a line of evidence which the state developed was admissible only as to one of them.[34]

The state, on the other hand, maintains that the conspiracy was conceived during the initial conversation between Rogers and Tuitczenko. According to the state, the statements do not constitute hearsay as to any of the defendants, despite the fact that some joined the conspiracy a substantial period of time after its inception.

The elements of conspiracy were stated in *State v. Nutley*:[35]

(1) An agreement among two or more persons to direct their conduct toward the realization of a criminal objective.

(2) Each member of the conspiracy must individually consciously intend the realization of the particular objective. Each must have an individual "stake in the venture."

Applying these principles to the testimony presented at trial, we hold that the conspiracy in which the defendants all eventually took an active part came into existence during the initial conversation between Rogers and Tuitczenko.

---

[34] *State v. Nutley*, 24 Wis.2d 527, 543, 129 N.W.2d 155 (1964), *cert. denied* 380 U.S. 918 (1965).

[35] *Id.* at 556.

The following testimony demonstrates that an agreement was reached between the original coconspirators, Rogers and Tuitczenko. At lunch on August 16, 1975, Rogers announced his intention to carry out the robbery of Bryant's. As the initial step in effectuating this plan, he sought to avail himself of Tuitczenko's knowledge of Bryant's and its design; Tuitczenko, fully aware of Rogers' intention, apprised her coconspirator of the interior layout of Bryant's.

The same testimony indicates the conscious intent of Tuitczenko and Rogers to realize the criminal objective of the conspiracy. Rogers announced the criminal objective and committed himself to its realization. Tuitczenko acquiesced in that commitment by providing the information necessary to begin the march toward the realization of the objective. Therefore, the conspiracy was in existence at that moment.

The statements were also in furtherance of the conspiracy. One brought the conspiracy into existence, seeking out the necessary agreement by Tuitczenko; the second was an affirmative step toward the realization of the objective, permitting planning of the operation.

The requisites of sec. 908.01(4)(b)5, Stats., have been met. The statements were offered in evidence against these parties, were made during the course of the conspiracy and, were made in furtherance of the conspiracy.[36]

All of the defendants eventually became active participants in this conspiracy. Section 908.01(4)(b)5, Stats., implements, in reference to statements of coconspirators, the general rule of law: "One may join a conspiracy already formed and in existence and be bound by all that has gone on before in the conspiracy, even if unknown to

---

[36] The same analysis applies to Rogers' request that Tuitczenko retrieve the gun at his residence and to all subsequent statements made by any defendant which was in furtherance of the conspiracy.

him."[37] Therefore, the testimony was admissible as to all of the defendants and severance need not have been granted on this basis.

## D.

### ANTAGONISTIC THEORIES OF DEFENSE AS EVIDENCED IN CLOSING ARGUMENTS

The final basis asserted by the defendants in support of their contention that prejudicial error occurred in the denial of their motions for severance is that the defendants asserted antagonistic defenses. They point to the closing arguments of counsel as evidencing the intention of each defendant to shift the blame for the actual shooting of Dennis O'Bradovich to the other defendants, thereby attempting to exculpate himself as to the charge of first-degree murder.

Our examination of the record has disclosed instances during closing arguments in which counsel for one of the defendants, without mentioning any other defendant by name, did attempt to persuade the jury that his client neither shot Dennis O'Bradovich nor was in any way criminally liable for that act.[38] In addition, at various points throughout the trial, defense counsel for one of the defendants posed questions on cross-examination which were calculated to elicit answers indicating that

[37] *United States v. Knight,* 416 F.2d 1181, 1184 (9th Cir. 1969). *Also see* cases digested under "Conspiracy," Key Number 40.3, "Persons joining after formation of conspiracy" in West Federal Practice Digest, 3d ed.

[38] For example, Defense Counsel Francis Croak, speaking of and for defendant Rolf, stated in his closing argument:

The shooting in this case by all the evidence against my client, clearly indicates that he didn't participate in it. His gun wasn't fired . . . . His gun was a twenty-five. No twenty-five was fired there. (T. 4916).

his client did not participate in the actual shooting of Officer O'Bradovich.

The defendants claim that as a result of the antagonistic defenses and the trial court's refusal to sever their trials under sec. 971.12(3), Stats., each defendant was forced to rebut not only the attacks of the state, but also those of his codefendants.[39]

A trial court has the power to try cases together when the defendants are charged with the same offenses arising out of the same transaction and provable by the same evidence.[40] The decision to try defendants jointly or to sever their trials is a matter resting largely within the discretion of the trial court. On appellate review, this exercise of discretion is not the subject of correction in the absence of abuse.[41]

Trying defendants in a consolidated trial under the circumstances described above is an invaluable tool to promote economy and efficiency in the administration of justice by avoiding repetitious litigation and to promote the convenience of witnesses and the public by avoiding repeated appearances in court.[42] We also point out that a joint trial is beneficial to a defendant in avoiding undue delay in affording him his day in court.[43]

However, even significant state interests must yield to the defendants' due process right to a fair trial if a joint

[39] *Jung v. State,* 32 Wis.2d 541, 546, 145 N.W.2d 684 (1966), *cert. denied,* 386 U.S. 999 (1967).

[40] *Id.* at 545; sec. 971.12, Stats.

[41] *Id.*

[42] *State v. Nutley, supra* at 543.

[43] Clearly such a delay would be justified under the test of *Barker v. Wingo,* 407 U.S. 514 (1972) if it were caused by the fact that the state's witnesses were tied up in the conduct of separate trials which were accorded at the request of the criminal defendants themselves.

trial would be unduly prejudicial.[44] The right to a fair trial has been found to be unduly prejudiced where the defendants in a joint trial assert antagonistic defenses.[45]

Although there is authority in this state to support the assertion that antagonistic defenses cannot constitute the basis for severance when, as in this case, the individual defendants do not testify, we do not rely upon that authority in resolving this issue.[46]

The Wisconsin Supreme Court has held that testimony by a codefendant, the effect of which is only cumulative with respect to the evidence previously adduced by the state, does not constitute grounds for severance.[47] The evidence introduced by the state clearly established the part each defendant played in the conspiracy. The evidence that the bullet which ultimately caused the death of Dennis O'Bradovich was fired from the gun of Cranmore was overwhelming. The references made by any other defendants were, at most, cumulative regarding that fact.

Nor do we view these assertions as evidencing antagonistic defenses. The defendants stood together on a self-defense theory against the charge of first-degree murder. As we hold in a subsequent section of this opinion, there was no basis in the record to establish any theory of self-defense. All of the defendants were parties to a conspiracy to commit armed robbery. Cranmore committed first-degree murder in pursuance of that intended crime under circumstances which made it a natural and prob-

[44] *State v. Nutley, supra; Jung v. State, supra; Lampkins v. State,* 51 Wis.2d 564, 187 N.W.2d 164 (1971); *State v. Shears,* 68 Wis.2d 217, 229 N.W.2d 103 (1975); *Butala v. State,* 71 Wis.2d 569, 239 N.W.2d 32 (1976).

[45] *Pollack v. State, supra; Mandella v. State,* 251 Wis. 502, 29 N.W.2d 723; *State v. Nutley, supra; Jung v. State, supra.*

[46] *Lampkins v. State, supra* at 572.

[47] *State v. Shears, supra* at 237 [citing *United States v. Wilson,* 434 F.2d 494 (D.C. Cir. 1970)].

able consequence of the intended crime. All the defendants were, therefore, guilty of the commission of the crime of first-degree murder[48] and their defenses cannot be said to have been antagonistic under the circumstances.[49]

As we have with all the preceding bases asserted by the defendants to support their claim of error in the failure to sever, we hold that the trial court was correct in refusing to sever the defendants' trials on this basis.

Having addressed all of the asserted bases and finding them without merit, we hold that the trial court was correct in denying the motions of the defendants for severance.

## III.

### *LIMITATION OF THE SCOPE OF CROSS-EXAMINATION OF VERA TUITCZENKO REGARDING THE POSTCONSPIRACY STATEMENT OF CRANMORE*

Pursuant to its order admitting into evidence the remainder of the partially deleted statement of Cranmore made to Tuitczenko, the trial court restricted cross-examination of Tuitczenko regarding this statement to avoid any reference to the nondeclarant defendants.

Defense counsel for Cranmore objected that such a procedure denied his client the right to confront witnesses

---

[48] *State v. Nutley, supra* at 559; Wis. J.I.—Criminal–400.

[49] There is no assertion that the defendants maintained antagonistic defenses to the charges of armed robbery. They appeared to rely collectively on a defense of insufficiency of the evidence; therefore, there was no conflict therein. *State v. DiMaggio*, 49 Wis.2d 565, 182 N.W.2d 466 (1971), *cert. denied*, 404 U.S. 838 (1971).

against him, in violation of the sixth amendment, and due process of law, in violation of the fourteenth amendment. Counsel argued that unless he were allowed to fully cross-examine Tuitczenko, he could not impeach her credibility and demonstrate that her testimony should not be believed. According to defense counsel, Tuitczenko testified in an offer of proof regarding the statement that Cranmore had stated Rolf was upstairs with him. He correctly pointed out that it was Prihoda who was upstairs with Cranmore and asserted that this discrepancy would severely affect Tuitczenko's credibility.

The right to confront witnesses against a defendant is a fundamental right and fully embraces the right to cross-examine those witnesses. The United States Supreme Court has stated:

The right of cross-examination is more than a desirable rule of trial procedure. It is implicit in the constitutional right of confrontation, and helps assure the "accuracy of the truth determining process" . . . . It is, indeed, "an essential and fundamental requirement for the kind of fair trial which is this country's constitutional goal." Of course, the right to confront and to cross-examine is not absolute and may, in appropriate cases, bow to accomodate (sic) other legitimate interests in the criminal trial process. . . . But its denial or significant diminution calls into question the ultimate "integrity of the fact-finding process" and requires that the competing interest be closely examined.[50]

The balancing called for by the *Chambers* mandate requires that this court determine the following:

1. Was the defendant's right to confront the witnesses against him denied or significantly diminished?[51]

[50] *Chambers v. Mississippi*, 410 U.S. 284, 295 (1973).

[51] *Dutton v. Evans, supra* at 88.

2. If so, what "legitimate interests" are asserted by the state in justification of this denial or diminution,[52] if any?[53]

## A.

### WAS CRANMORE'S RIGHT TO CONFRONT TUITCZENKO REGARDING HIS STATEMENT DENIED OR SIGNIFICANTLY DIMINISHED?

It cannot be seriously asserted that the confrontation right in this instance was denied. Counsel for Cranmore was authorized to cross-examine the witness regarding the statement as long as he did not attempt to elicit testimony referring to the other defendants. He availed himself most effectively of this opportunity, as we point out below.

The question then remains whether there was a significant diminution of the cross-examination right by virtue of the court's order.

Counsel for Cranmore cross-examined Tuitczenko on the following subjects immediately after her testimony regarding the statement: was she awaiting sentencing on certain charges arising out of this incident; had a plea bargain agreement been concluded between herself and the state;[54] her failure to inform the police that

---

[52] *Davis v. Alaska,* 415 U.S. 308 (1974); *Mancusi v. Stubbs,* 408 U.S. 204 (1972); *State v. Olson,* 75 Wis.2d 575, 250 N.W.2d 12 (1976).

[53] *Chambers v. Mississippi, supra* at 297. The court therein found no legitimate interest of the state which supported diminution of the right of confrontation in this instance on the basis of the "voucher rule."

[54] Tuitczenko stipulated to waiver of jurisdiction of the juvenile court and entered a guilty plea to one count of armed and masked robbery. In return she was granted immunity on the charge of murder and other armed robbery counts.

Cranmore had made such statement until December, 1975; her discussion with the prosecutor regarding her testimony; her romantic entanglement with Rogers, which continued well beyond the time of his arrest in connection with this crime, and her letter writing and jail visits; her ability to recall the circumstances and surroundings in which the statement was given; her frame of mind when the statement was made—"frightened," "panic-stricken"; the fact that the written confession which she gave to the police on the day of her apprehension, the same day the Cranmore statement was purportedly made, contained no references to that statement; the fact that the inculpatory statement was not brought forward until after the state promised "a deal" and her hope that testifying for the state would bring a lighter sentence, possibly probation.

It is also to be noted that this was the second time Tuitczenko was on the stand and subject to cross-examination. When first she testified, counsel for the various defendants, on cross-examination, covered these subjects, among others: her release from custody, shortly after she was arrested, on a signature bond, remaining free up until the time of her testimony; her sentencing had been delayed until March of 1976, even though her plea had been entered in December of 1975; her memory as to what was said in the car while driving to Bryant's and the physical appearance of the defendants at the time of the robbery.

Counsel for Cranmore, in arguing against limitation of the scope of his cross-examination, pointed out that in recording an offer of proof of Tuitczenko's testimony regarding the Cranmore statement, the court reporter understood her to testify that Cranmore said he was "upstairs with Brian." The record reflects this statement and counsel maintained that this would render her testimony incredible in view of the fact that evidence clearly demonstrated that Rolf was in the downstairs lounge.

However, the prosecutor, upon being apprised of the court reporter's understanding, the state of the record and Cranmore's counsel's intention to utilize this inconsistency for purposes of impeachment, stated for the record that he had spoken with Tuitczenko and she emphatically asserted that the actual content of her testimony was "the upstairs of Bryant's." The trial judge also stated for the record that the notes which he made during the offer of proof indicated that the correct testimony was "the upstairs of Bryant's."

The conclusion is irresistible that impeachment on the basis of this purported inconsistency would have been of little benefit to Cranmore. The prospect that this impeachment would have established the unreliability of Tuitczenko's testimony to any greater extent than the impeachment which was actually effected was "wholly unreal."[55]

Cranmore effectively availed himself of an opportunity to impeach the testimony of Tuitczenko regarding the inculpatory statement. He also benefited by the impeachment of her prior testimony regarding the entire sequence of events. We conclude that no more effective impeachment could have been achieved. We therefore hold that Cranmore's right to confrontation was neither denied nor significantly diminished.[56]

### B.

### COUNTERVAILING STATE INTEREST

In ordering the limited cross-examination of Tuitczenko, the trial court was protecting the nondeclarant de-

---

[55] *Dutton v. Evans, supra* at 88.

[56] Contrary to the position of the defendants, we do not believe that in testifying as to the postconspiracy statement of Cranmore, Vera Tuitczenko was a witness "against" the remaining defendants. There is no sixth amendment issue as to them.

fendants from implication in the extrajudicial statement of Cranmore and their sixth amendment right to confront witnesses. Stated another way, "The trial court attempted to avoid a *Bruton* problem by limiting Ms. Tuitczenko's testimony . . . ."[57]

However, the defendant's rights could also have been protected and the *Bruton* problem avoided by severance. Therefore, the basic countervailing interest asserted by the state is its interest in economy and efficiency in the administration of justice.[58] Because there was no significant diminution of the right of confrontation under the test of *Chambers,* the limitation of cross-examination was constitutionally justifiable on the basis of the legitimate interest asserted by the state.[59]

## IV.

### *SELF-DEFENSE*

Defendants maintain that the trial court committed prejudicial error in refusing to instruct the jury regarding the privilege of self-defense[60] and the offense of manslaughter by use of excessive force in the exercise of the privilege of self-defense.[61]

Section 939.48(1), Stats., defines the privilege of self-defense. The statute specifically denies the privilege to a person who provokes an attack upon himself by illegal conduct,[62] except in two circumstances. Under limited circumstances, an initial aggressor retains his privilege of self-defense because the attack which is launched in response by the initial victim escalates the encounter

[57] Defendant's Brief at p. 31.

[58] This interest was cited in *State v. Olson, supra* at 591, another confrontation clause case.

[59] *State v. Olson, supra; Davis v. Alaska, supra.*

[60] Sec. 939.48, Stats.

[61] Sec. 940.05(2), Stats.

[62] Sec. 939.48(1)(a), Stats.

"beyond that which would be legally justifiable in view of the nature of the original provocation."[63] The defendants do not contend that the evidence adduced supports an assertion of privilege under this exception. The second exception is stated in sec. 939.48(2)(b), Stats.: "The privilege lost by provocation may be regained if the actor in good faith withdraws from the fight and gives adequate notice thereof to his assailant."

The defendants admit that they were initially the aggressors in their encounter with Dennis O'Bradovich and were denied the privilege of self-defense. However, they also assert that there was evidence in the record to support a finding that subsquent to the initial exchange of gunfire with Officer O'Bradovich, there was a decision to withdraw. The defendants point with particularity to portions of the record which indicate that after the first exchange had been completed, one of the defendants, with all of the others present, stated: "Let's get out of here."[64] Therefore, according to the defendants' theory, when they opened the vestibule door attempting to leave the bar and were greeted with a salvo from O'Bradovich's gun,[65] thy were fully privileged to utilize deadly force in defense of themselves.

The trial court refused to submit any instructions regarding the law of self-defense, emphatically stating that there was no evidence in the record to support any finding other than that the defendants were initially the aggressors and remained so throughout the course of this incident.

We are in complete agreement with the conclusion of the trial court. We do not believe that the actions of the defendants fulfilled either condition necessary to regain the privilege of self-defense.

---

[63] *Ruff v. State*, 65 Wis.2d 713, 727, 223 N.W.2d 446 (1974).

[64] We take that statement in context as "Let's escape!"

[65] Officer Drefahl testified that both the first exchange of gunfire and the second were initiated by Officer O'Bradovich.

## A.

## THE DEFENDANTS DID NOT "WITHDRAW" FROM THE CONFLICT THEY HAD PROVOKED

" [T]he situation of being one who withdraws and gives his adversary reasonable ground for believing that he has withdrawn does not describe an armed gunman who has a . . . revolver in hand" and is attempting to successfully escape from the scene of the crime.[66]

The term "withdrawal" is a term of limited applicability which cannot be expanded to confer the privilege of self-defense on every lawbreaker who emerges from the scene of a crime brandishing a weapon. "Withdrawal means abandoning the enterprise, not leaving the scene."[67] The statement relied upon by the defendants can in no way be interpreted to constitute "an abandonment of the enterprise" and for that reason alone, the trial court was justified in refusing to give the requested instructions.[68]

## B.

## THE DEFENDANTS DID NOT GIVE ADEQUATE NOTICE TO OFFICER O'BRADOVICH OF THEIR "WITHDRAWAL" FROM THE CONFLICT

A finding by this court that the defendants withdrew from the conflict would not be sufficient to accord them

[66] *Ruff v. State, supra* at 725.

[67] *Banks v. State,* 51 Wis.2d 145, 161, 186 N.W.2d 250 (1971) (Hansen, J., dissenting). We note that defendant Rogers, who announced this "withdrawal," was shot, according to the testimony of Milwaukee police officer Charles Waldock, when he turned and raised his gun toward this officer while attempting to effect his escape.

[68] We are of the opinion that if the defendants truly intended to withdraw from the conflict, they would have discarded their weap-

the privilege of self-defense. While one may withdraw, the privilege of self-defense is not reacquired until the party gives "adequate notice" of withdrawal to his "assailant."[69] The record clearly shows, and the defendants admit, that Officer O'Bradovich was outside the vestibule door at the time the "withdrawal" was announced. Without question, the condition of adequate notice was not fulfilled by the defendants and that constitutes an independent legal basis for the refusal to instruct the jury regarding self-defense.

The defendants have placed primary reliance on *Banks v. State, supra,* for their assertion that the defendants had withdrawn. They maintain that the factual situation in *Banks* is analogous to that which is presented here. We do not find any similarity.

In *Banks,* the Wisconsin Supreme Court found that the armed robber had completed his illegal activity,[70] and his actions subsequent to the completion of those acts gave adequate notice to the initial victim that he did not intend to further threaten or injure anyone. Under those limited facts, the court found the defendant was entitled to have the jury instructed regarding the privilege of self-defense.

The actions of the defendants in the instant situation were not adequate to convey the impression that they intended to discontinue their life-threatening activities, particularly to O'Bradovich.[71] They continued to carry their weapons in a dimly-lit bar crowded with robbery victims. Further, they chose to leave through an exit

ons and taken any other necessary steps to communicate their inability and lack of intention to inflict further harm.

[69] Sec. 939.48(2)(b), Stats. *See also United States v. Petersen,* 483 F.2d 1222, 1230 (D.C. Cir. 1973), *cert. denied,* 414 U.S. 1007 (1973).

[70] The court stated: "[T]he defendant *had been engaged* in unlawful conduct." 51 Wis.2d at 156 (Emphasis supplied.)

[71] *See* n. 67, *supra.*

behind which they had reason to expect that a further armed exchange was likely. Under these circumstances, unlike those in *Banks,* the victim was clearly justified in believing the defendants continued to present a threat of imminent danger to the lives of the bar patrons and to himself.[72]

The trial court was correct in its refusal to instruct the jury regarding the law of self-defense.

### V.

### FAILURE TO INSTRUCT JURY ON SECOND- AND THIRD-DEGREE MURDER

Defendants assert as a further ground for reversible error the failure of the trial court to instruct the jury on second- and third-degree murder.[73] We conclude that the trial judge was correct in his refusal to do so.

---

[72] At oral argument, counsel for defendants relied upon the tragically similar factual situation of *State v. Mendoza,* 80 Wis.2d 122, 258 N.W.2d 260 (1977). We find that case totally inapplicable. In *Mendoza,* the Supreme Court held at p. 155:

[T]hat there exists no evidence from which the jury could believe defendant's use of deadly force was reasonable, entitling him to an instruction on complete self-defense. However, a majority also holds that under one reasonable view of the evidence, the jury could conclude that defendant's belief that he could act in self-defense was reasonable. The defendant was thus entitled to have the jury consider his theory of "imperfect self-defense," which is embodied in the crime of manslaughter.

There is no evidence in the record before this court by which a jury could reasonably conclude that the defendants' use of deadly force was reasonable nor that their belief that they could act in self-defense was reasonable.

[73] We have found the defendants' assertion that the theory of self-defense was available to them erroneous in the preceding section of this opinion. Therefore, we do not address the assertion that they were entitled to an instruction regarding self-defense

The rule regarding the circumstances for submission of instructions on lesser included crimes has been stated on numerous occasions:

> [T]here must be a reasonable ground in the evidence for acquittal on the greater charge and conviction on the lesser charge . . . . The key word is "reasonable." The rule does not suggest some near automatic inclusion of all lesser but included offenses as additional options to a jury. Only if "under a different, but reasonable view," the evidence is sufficient to establish guilt of the lower degree and also leave a reasonable doubt as to some particular element included in the higher degree but not the lower, should the lesser crime be submitted to the jury . . . *Ross v. State,* 61 Wis.2d 160, 169, 211 N.W.2d 827 (1973).

The evidence adduced must be viewed in a light most favorable to the defendants, but juries cannot be allowed complete discretion in the determination of what crime the accused should be found guilty.[74]

The defendants maintain that the jury could have concluded, under a reasonable view of evidence, that the defendants did not intend to kill Dennis O'Bradovich. We state our reasons for concluding as to each defendant, there could be no reasonable doubt as to the intent to kill O'Bradovich.

## DEFENDANT ROGERS

1. In masterminding the robbery, he anticipated the use of deadly weapons and procured at least one for that purpose.

under sec. 939.04, Stats., and manslaughter by excessive use of force in the exercise of the privilege of self-defense under sec. 940.-05(2). Stats.

[74] *See Leach v. State,* 83 Wis.2d 199, 217, 265 N.W.2d 495 (1978); *State v. Melvin,* 49 Wis.2d 246, 253, 181 N.W.2d 490 (1970).

2. He entered Bryant's, a crowded bar, carrying a loaded weapon.

3. Upon entering, he gave orders to the patrons while brandishing his weapon.

4. When Officer O'Bradovich opened fire, wounding him, he fired at least two shots in return, striking the officer once.

5. Having been wounded, he did not retreat and accept the failure of the endeavor; rather, having watched Cranmore emerge from the upstairs firing blindly into a crowd of innocent people, he sought Cranmore's assistance to effectuate an escape.

6. He concurred in a decision to leave via the door through which they had entered, with reasonable expectations of further resistance behind that door. He also had just viewed a demonstration of Cranmore's lethal response to such resistance.

7. He accompanied Cranmore through that door and Dennis O'Bradovich was shot to death.

## DEFENDANT ROLF

1. He entered Bryant's with a loaded weapon.

2. He gave orders to the patrons while brandishing his weapon. Immediately prior to the shooting, he was holding the weapon in the rib cage of one of the robbery victims.

3. When the first shots were fired, he watched Rogers respond by firing his weapon at Dennis O'Bradovich, wounding him.

4. He watched as Cranmore emerged from the upstairs firing blindly into a crowd of innocent people and, instead of retreating, he rushed to the aid of Rogers and willingly participated in the attempt to effectuate an escape. By this time the actions of his coconspirators have put him on notice that the escape would be effectuated at any cost.

5. He then assisted Rogers to the door and acquiesced in the decision to leave through that door, knowing that, in all likelihood, further resistance lay behind that door.

6. Acting in conformity with the prior use of his gun witnessed by Rolf, Cranmore emptied his gun into Dennis O'Bradovich.

## DEFENDANT CRANMORE

1. He entered Bryant's with a loaded weapon.
2. He proceeded to the upstairs lounge and ordered patrons to the floor while waving the gun about.
3. While he was in the upstairs lounge, the life of one of the patrons was threatened.
4. When he heard gunfire coming from the downstairs lounge, he raced down the stairs firing blindly into a crowd of innocent people, wounding two patrons.
5. When he met further resistance, he emptied his weapon into Dennis O'Bradovich while he was lying on the ground. By his own admission, he aimed for O'Bradovich's head while doing so.[75]

In claiming they were entitled to instructions on lesser degrees of murder, the defendants have emphasized that it was Officer O'Bradovich who initiated the shooting, stating that the tavern turned into nothing more than a "shooting gallery." We point out that the officer was reacting to the life-threatening actions of the defendants. We believe that after the initial exchange of gunfire, all of the defendants had the opportunity to withdraw. They need not have surrendered to avoid the consequences which befell O'Bradovich and themselves. Although they could have left the premises by another exit, none of them chose to do so. They shot their way out. The only reasonable conclusion to be drawn is that each defendant intended the death of Dennis O'Bradovich.[76]

The trial judge examined the evidence which had been adduced and made that determination. There is no indi-

---

[75] "When one intentionally points a loaded gun at a vital part of the body of another and discharges it, it cannot be said that he did not intend the natural, usual and ordinary consequences . . . ." *Holmes v. State*, 63 Wis.2d 389, 401–02, 217 N.W.2d 657 (1974).

[76] *Cf. Leach v. State, supra* at 217.

cation that he required the defendants to produce any evidence to justify submission of lesser-included crimes.[77]

Finally, the defendants contend that instructing the jury that the defendants were "presumed to intend all of the natural, probable and usual consequences of their deliberate acts"[78] relieved that state of the burden of proving beyond a reasonable doubt the defendants' intent to kill Dennis O'Bradovich and denied them due process of law.

The jury instructions presently utilized in Wisconsin (and which were utilized in this trial)[79] regarding the presumed intent of a criminal defendant are fraught with the peril that a jury may construe an instruction as directive rather than permissive. The permissible use by a jury of such an instruction in its analysis of the evidence was recently explicated:

> The term "presumption" is used in many ways in the law. In the case at bar the court is using the word presumption to describe the process of reasoning that may lead the trier of the fact to conclude that intent was present . . . .

---

[77] The defendants raise this contention in their brief. We find no merit in the contention.

[78] Wis. J.I.—Criminal–1100.

[79] The Uniform Criminal Jury Instructions Committee to Wisconsin Criminal Court Judges has adopted new language to be utilized in instructing a jury regarding the issue of intent of a criminal actor, deleting any reference to "presumed intent." The new language is:

"Intent to ——— must be found as a fact before you can find the defendant guilty of ———. You cannot look into a person's mind to find out his/her intent. You may determine such intent directly or indirectly from all the facts in evidence concerning this offense. You may consider any statements or conduct of the defendant which indicate his/her state of mind. You may find intent to ——— from such statements or conduct. You are the sole judges of the facts and you must not find the defendant guilty unless you are satisfied beyond a reasonable doubt that the defendant intended to ———."

The Court is saying that a trier of fact logically and correctly may find the requisite intent from the defendant's words or conduct, not because the law requires such a finding, but because jurors using ordinary reasoning may determine that the defendant's words or conduct are inferentially probative of the requisite intent. Thus, in the instant case, we conclude that the evidence concerning Lofton's words and behavior was sufficient to prove intent to kill beyond a reasonable doubt.[80]

As in *Lofton,* we conclude that the words and behavior of each of the defendants was sufficient to prove intent to kill beyond a reasonable doubt. We have previously stated our reasons for arriving at that conclusion as to each defendant.[81]

There was no error committed with respect to the instructions which were given to the jury.

## VI.

### CAUSE OF DEATH

The defendants are of the opinion that the jury could reasonably have concluded that the death of Dennis O'Bradovich was caused by the actions of his attending physicians in performing a nephrectomy (removal of kidneys) and in discontinuing the respirator and the administration of pressor drugs (artificial aids to maintain blood pressure in the body). Defendants state that it was reversible error not to instruct the jury on the question of what constitutes death or when it can be said to occur, as was requested by the defendants.[82]

---

[80] *Lofton v. State,* 83 Wis.2d 472, 490–91, 266 N.W.2d 576 (1978) (Abrahamson, J., concurring).

[81] *See* pp. 42–43, *supra.*

[82] Defendants also requested an instruction to the jury regarding attempted murder on this basis.

The state maintains in its brief that the question of when death occurs is irrelevant. It maintains that its burden was met in proving that the gunshot wound inflicted by the defendants was a "substantial factor in producing death."[83] The state asserts that defendants could not be relieved of their liability for the death of Officer O'Bradovich unless the subsequent actions of the attending physicians could be found to be the sole cause of death.[84]

Three medical experts testified regarding the question of when death occurred. Although none testified as to a specific time that death occurred,[85] all concurred in the assertion that death had occurred prior to the performance of the nephrectomy, although blood pressure and respiration were being maintained by artificial means up to and through the operation to remove the kidneys.

The most extensive testimony on the question of death was offered by Dr. Joseph Cusick, an attending surgeon in the neurosurgery department of County General Hospital. The doctor testified to a reasonable degree of medical certainty that Dennis O'Bradovich's brain was "irreversibly damaged" and could never "regain any functions whatsoever" as of approximately 9:30 a.m. on August 17, 1975. Among other factors, the conclusion was based on the following: a flat EEG tracing;[86] his pupils were fixed and dilated, unresponsive to exposure to di-

---

[83] *People v. Brown*, 15 Ill. App.3d 528, 373 N.E.2d 459 (1978); Wis. J. I.—Criminal–1102; *Cf. Loew v. State*, 60 Wis. 559, 19 N.W. 437 (1884).

[84] Citing *DeVaughn v. State*, 232 Md. 447, 194 A.2d 109, 113 (1963).

[85] The time of death listed on the death certificate, 4:14 p.m. on August 18, 1975, was subsequent to the removal of the kidneys from Dennis O'Bradovich's body.

[86] Indicating a lack of electrical activity in the brain.

rect light; he no longer had "doll's eye" reflex;[87] he was areflexis (there was no reflex to noxious or painful stimuli); he had no spontaneous respiration after three minutes off the respirator; there was a negative cold caloric testing, indicating a lack of brainstem function.[88]

Dr. Herbert Kaufman, the surgeon who performed the nephrectomy, stated that the conclusion of irreversible brain death could not be escaped at 10:30 a.m. on August 18, 1975. He further testified that Dennis O'Bradovich's respiration would have ceased before the nephrectomy, had it not been maintained by artificial support, and that that he would not have had continued blood circulation up to the time of the operation but for the administration of vasso pressor agents.

Dr. Chesley Erwin, the Milwaukee County Medical Examiner, testified that he examined O'Bradovich prior to the nephrectomy and concluded that he was dead at that time. He testified that death was caused by the gunshot wound to the head.[89]

What actually constitutes death and the time of its occurrence has not been defined in Wisconsin.[90] Historically, the determination of the fact and time of death was keyed to the action of the heart and blood circulation.[91]

---

[87] This indicates that the eyes no longer responded to rapid movement of the head from side to side or up and down. If the brain were functioning, it would dictate movement of the eyes in a direction opposite of the movement of the head.

[88] Testimony indicated that these were commonly accepted indications of irreversible brain damage or brain death.

[89] On cross-examination of these witnesses, certain inconsistencies were demonstrated. In view of our resolution of this issue, it is not necessary to repeat this testimony.

[90] The Wis. legislature is presently attempting to do so. *See also* sec. 155.06(7)(b), Stats.

[91] *Matter of Quinlan*, 70 N.J. 10, 355 A.2d 647 (1976); *Black's Law Dictionary*, p. 488 (rev. 4th ed. 1968).

However, advances in the medical sciences "can now restore 'life' as judged by the ancient standards of persistent respiration and continuing heartbeat. This can be the case even when there is not the remotest possibility of an individual recovering consciousness following massive brain damage."[92]

We do not choose to define death,[93] nor do we believe that the trial court was required to do so. We need only determine whether the jury could reasonably be convinced from the evidence which it had a right to believe and accept as true that the defendants were responsible for the death of Dennis O'Bradovich. There was competent evidence from which the jury could conclude, according to a common law theory of death (blood circulation and pulmonary activity), or according to the "brain death theory," that death occurred before the nephrectomy. The evidence was sufficient to establish cause of death beyond a reasonable doubt.[94]

However, the jury was not required to find, nor was the state required to prove, that Dennis O'Bradovich was dead prior to the performance of the nephrectomy. Even

[92] "A Definition of Irreversible Coma," 205 J.A.M.A. 337, 339 (1968). The official comment to Section 7, *Uniform Anatomical Gift Act*, (sec. 155.06(7)(b), Stats.) comment para. 2 states: "Modern methods of cardiac pacing, artificial respiration, artificial blood circulation and cardiac stimulation can continue certain bodily systems and metabolisms far beyond spontaneous limits. The real question is when have irreversible changes taken place that preclude return to normal brain activity and self-sustaining bodily functions."

[93] We do not believe this is a proper case to do so. The defense produced no medical expert to address the question; the standards of the "Ad Hoc Committee of the Harvard Medical School to Examine the Definition of Brain Death" were not fully complied with, and; a legislative committee is presently attempting to draft an acceptable definition.

[94] *Murphy v. State*, 75 Wis.2d 522, 526, 249 N.W.2d 779 (1977).

were we to find that the attending physicians were negligent in believing that the officer was dead and that their negligence contributed to his death, this would not break the chain of causation between the defendants' acts and the consequent death.[95] The state is only required to prove beyond a reasonable doubt that the defendants' acts were "a substantial factor in producing the death."[96]

The efforts of the attending physicians in this case appear to us to have been extraordinary. Even were we to find them negligent in believing Dennis O'Bradovich was dead when his kidneys were removed, that fact would be insufficient to relieve the defendants of responsibility for the death. That the acts of the defendants were a substantial factor in producing his death was proved beyond any possible doubt.

## VII.

### SENTENCING

Defendants contend that the length of the sentences are excessive and their imposition was an abuse of discretion. They base this assertion on the fact that consecutive sentences were imposed for convictions arising out of a single episode.[97]

In sentencing these defendants the record reflects the trial court's consideration of the following facts: the defendants' personality and attitude, the viciousness and aggravated nature of the crime, the manner in which

[95] 40 C.J.S. *Homicide*, sec. 11, p. 852 (1944); *People v. Brown*, *supra*.

[96] Wis. J.I.—Criminal–1102, *supra*.

[97] *State v. Shaffer*, 223 Kan. 244, 576 P.2d 205 (1977). The facts and asserted defense in this case are precisely the same as those with which we are faced.

the crime was planned and executed, the need for close rehabilitative control, and the rights of the public.

All these factors are proper considerations in the imposition of sentences.[98] The record demonstrates that the sentences were imposed pursuant to "a process of reasoning based on facts that are of record or that are reasonably derived by inference from the record."[99] The sentences imposed represent a "conclusion based on a logical rationale founded upon proper legal standards,"[100] and there is no basis upon which this court could justify interference with the proper exercise of discretion by the trial court.

*By the Court.*—Judgment and orders affirmed.

---

[98] *Green v. State,* 75 Wis.2d 631, 642, 250 N.W.2d 305 (1977).
[99] *Ocanas v. State,* 70 Wis.2d 179, 185, 233 N.W.2d 457 (1975).
[100] *Id.*